**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHAWN GRAY,<br><br>                Defendant | Criminal Action No. 20-191 (CKK) |

**MEMORANDUM OPINION**
(May 31, 2021)

In this criminal action, Defendant Shawn Gray is charged with (1) Unlawful Possession of Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year in violation of 18 U.S.C. § 922(g)(1), and (2) Unlawful Possession of a Firearm by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year in violation of D.C. Code § 22–4503(a).  Indictment, ECF No. 1.  In his [14] Motion to Suppress Evidence, Gray seeks to suppress a loaded firearm recovered from inside his underwear, which he contends was obtained as a result of an allegedly unlawful seizure and search.  Gray argues that such evidence should be suppressed because it was seized in violation of the Fourth Amendment.  Gray has also filed a [22] Motion to Re-Open the Suppression Hearing, based on the Government's notice that it failed to notify the defendant of a potentially adverse credibility finding regarding one of it witnesses in advance of the evidentiary hearing.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court **DENIES** Defendant's Motion to Suppress and **DENIES** Defendant's Motion to

---

[1] The Court's consideration has focused on the following materials:
- Defendant's Motion to Suppress Evidence ("Def.'s Mot. to Suppress"), ECF No. 14;
- Government's Opposition to Defendant's Motion to Suppress Evidence ("Gov.'s Opp'n"), ECF No. 15;

Re-Open the Suppression Hearing. The Court concludes that the Fourth Amendment was not violated when law enforcement officers detained Gray, conducted a limited search of him, and seized from him a loaded firearm. The Court reaches this conclusion relying principally on the body-worn camera evidence and testimony of officers not implicated by the Government's *Giglio* notice, and does not find that re-opening the suppression hearing to recall the witnesses is required.

## I.   FINDINGS OF FACT

The Court held an evidentiary hearing on Gray's motion to suppress on May 6, 2021.[2]  The Court has considered the evidence presented during the hearing.  In doing so, the Court considered the demeanor and behavior of the witnesses, the witnesses' manner of testifying, whether the witnesses impressed the Court as truthful, whether the witnesses impressed the Court as having an accurate memory and recollection, whether the witnesses had any motive for not telling the truth, whether the witnesses had a full opportunity to observe the matters about which they testified, and whether the witnesses had any interest in the outcome of the case, or friendship or hostility to the other persons concerned with the case.  The Court also considered the reasonableness or unreasonableness and the probability or improbability of the testimony of the witnesses in determining whether to accept it as true and accurate, as well as whether the testimony was

---

- Defendant's Motion to Re-Open the Suppression Hearing ("Def.'s Mot. to Re-Open Hr'g"), ECF No. 22; and
- Government's Reply to Defendant's Motion to Re-Open Hearing ("Gov.'s Resp. to Mot. to Re-Open Hr'g"), ECF No 23.

[2] Due to health concerns surrounding the COVID-19 pandemic and with Gray's consent, the evidentiary hearing was held by videoconference.  *See In re: Fourth Extension of Authorization for Use of Video Teleconferencing and Teleconferencing for Certain Criminal and Juvenile Delinquency Proceedings*, Standing Order No. 21-14 (BAH) (Mar. 16, 2021) ¶. 8 ("For public health and safety reasons, the expectation is that most proceedings will be conducted remotely, via video or teleconference.").

contradicted or supported by other credible evidence.  The Court has also considered the pleadings, the footage from officers' body-worn cameras, and the entire record in this case.

Four witnesses testified during the May 6, 2021 evidentiary hearing: Metropolitan Police Department ("MPD") Officers John Bewley, Markell Jones, and Daniel Tipps testified on behalf of the Government, and the defendant, Shawn Gray testified on his own behalf.[3]

The Court makes the following findings of fact.  The Court will first make findings of fact that are relevant to the Defendant's motion and undisputed and/or uncontroverted by any evidence, and then make findings as to facts that are relevant and disputed or controverted by some evidence.

**A. The Undisputed or Uncontroverted Relevant Evidence**

MPD Officers John Bewley, [4] Markell Jones, and Daniel Tipps testified during the hearing. Officer Bewley has worked for MPD for nine years, Officer Jones for five years, and Officer Tipps for eight years.  May 6, 2021 Hr'g Tr., ECF No. 21 ("Hr'g Tr.") at 15:5–21 (Bewley),[5] 60:25–61 (Jones), 106:4–6 (Tipps).  As of September 2020, all three officers were assigned to MPD's Gun Recovery Unit.  Hr'g Tr. at 15:12–15 (Bewley), 61:3–6 (Jones), 106:7–10 (Tipps).  The Gun Recovery Unit is a "proactive unit" assigned to respond to areas that are high in gun violence or gun trafficking.  Hr'g Tr. at 16:5–14 (Bewley).  Gun Recovery Unit officers wear plainclothes—

---

[3] Before Gray testified, the Court confirmed that he had discussed his Fifth Amendment rights with his counsel, and was aware that his testimony could be used to impeach him in a later proceeding.  Hr'g Tr. at 113:21–115:10 (Gray).

[4] After the evidentiary hearing on May 6, 2021, the Government notified the Court of a "potential adverse credibility finding" regarding Officer Bewley's testimony in a separate case.  Although for the reasons discussed *infra* Section II(A), the Court does not find that this notice requires the Court to re-open the suppression hearing, the Court notes that its findings here rely primarily on the testimony of the other MPD officers and Gray, as well as the body-worn camera evidence.  To the extent the Court relies on Officer Bewley's testimony, it does so to corroborate the testimony of other witnesses or to provide additional contextual information.  None of the facts in dispute rely solely on the testimony of Officer Bewley.

[5] The name of the witness whose testimony is cited is indicated in parentheses following each citation to the May 6, 2021 Hearing Transcript.

shorts or non-uniform pants and tee-shirts—with blue vests with the word "Police" on the front and "Metropolitan Police Department" on the back and a police badge.  Hr'g Tr. at 17:9–23 (Bewley).  Officers Bewley, Jones, and Tipps were equipped with body-worn cameras, located in the center of their chests.  Hr'g Tr. at 19:14–18, 20:2–8 (Bewley), 100:17–22, 101:9–12 (Jones).  Because the body-worn cameras focus only straight ahead and are lower than the officers' sight-line, the camera does not capture everything that each officer sees.  *See* Hr'g Tr. at 100:23–7 (Jones).

On September 4, 2020, at 6:40 p.m.—while it was still daylight—approximately ten to twelve Gun Recovery Unit officers arrived at 1201 Mount Olivet Road NE in Washington, D.C. in three or four unmarked cars.  Hr'g Tr.  at 17:24–18:4, 47:17–48:5 (Bewley).  The Gun Recovery Unit responded to that address "in the gun interdiction capacity"  because of reports of gunshots in the area in the past 24 hours and a recent "uptick in violence throughout the city." Hr'g Tr.  at 62:4–14 (Jones).   Officer Bewley also noted that, based on prior experience and information provided by officers in MPD's Fifth District, this address is located in a "high gun-trafficking area."  Hr'g Tr. at 18:9–13, 19:2–3. (Bewley).

Officer Bewley drove one of the unmarked cars, with Officer Jones sitting directly behind him in the same car.  *See* Hr'g Tr. at 20:9–17 (Bewley), 75:18–24 (Jones); Gov.'s Ex. 1, Body-Worn Camera Video of Officer Markell Jones ("Jones BWC") at 18:40:00–18:40:37.[6]  Officer Tipps rode in a separate car, sitting in the backseat on the passenger side.  Gov.'s Ex. 3, Body-Worn Camera Video of Officer Daniel Tipps ("Tipps BWC") at 18:40:04–18:40:25; Hr'g Tr. at 112:17–25 (Tipps).  The cars pulled into an alley from a road behind a convenience store and

---

[6] The timestamps associated with all citations to body-worn camera videos refer to the time indicated in upper right-hand corner of the videos.

passed a silver BMW on their left-hand side, which was parked in the alley facing the road from which the police cars had entered.  Hr'g Tr. at 20:13–17 (Bewley), 63:4–12 (Jones).  Officer Bewley parked his car approximately 25-30 feet away from the BMW, so that the trunks of the cars faced each other.  *See* Hr'g Tr. at 119:1–3 (Gray) (testifying that when the police stopped in the alley, they were "probably about 25, 30 feet from where he was standing"); Gov.'s Ex. 2, Body-Worn Camera Video of Officer John Bewley ("Bewley BWC") at 18:40:47–18:40:50.  Several other cars were parked in the alley, which connected the road behind the store with a parking lot at the front of the store.  *See* Bewley BWC at 18:40:48–18:40:54.

When the Gun Recovery Unit officers exited their vehicles, some officers went towards the front of the store and spoke with individuals standing in the parking lot, asking who owned the cars parked there.  *See* Tipps BWC at 18:41:29–18:42:40; Bewley BWC at 18:40:33–18:40:40; Hr'g Tr. 21:15–19.  One officer can be heard asking an individual, "That's your car? No guns in it or anything, right? Can we take a look quick?" to which the person responded "no."  Bewley BWC at 18:41:56–18:42:05.

When Officer Jones exited his vehicle, he began looking in the windows of a gray car parked in the alley.  Jones BWC at 18:40:49–18:41:27.  Officer Jones's reflection on the side and windows of the car can be seen on his body-worn camera footage.  The reflection shows Officer Jones checking inside the vehicle, and then looking up towards his left, in the direction of the silver BMW.  Jones BWC at 18:41:09–18:41:11, 18:41:25–18:41:27; Hr'g Tr. at 86:12–24 (Jones).  Officer Jones testified that an individual standing by the car—later identified as Gray—caught his attention because he had moved from the driver's side of the car to the passenger's side as the police arrived (which Gray disputes, *see infra* Section I(B)), he was leaning over the car appearing

to try to hide something, and he was "looking at us with a wide-eyed stare and tracking our movements." Hr'g Tr. at 64:17–24 (Jones).

Officer Jones then walked towards the silver BMW, approaching from behind the car, on the passenger's side. Jones BWC at 18:42:05. As Officer Jones approached, Gray was leaning over the front passenger side window, with his left leg (the leg closer to Officer Jones) lunged in front. Jones BWC at 18:42:07. Gray testified that he was speaking to his girlfriend, who was sitting in the driver's seat of the car. Hr'g Tr. at 120:4–11 (Gray). There was approximately two to three feet of space between Gray's back and a chain-link fence lining the side of the alley. Hr'g Tr. at 119:20–22 (Gray); *see also* Jones BWC at 18:42:07. Gray was wearing a white tee-shirt and blue athletic shorts with an orange stripe on the side over black compression pants, which went to his ankles, and black sneakers. Jones BWC at 18:42:07. Officer Jones testified that once he was three or four feet away from Gray, he could see "an obvious bulge inconsistent with the human anatomy" in the front of Gray's shorts. Hr'g Tr. at 64:17–24, 70:14–21 (Jones).

As Officer Jones approached Gray, he asked, "How are you doing, sir? No guns, right?" Jones BWC at 18:42:06–18:42:11. Gray shook his head and said no. Jones BWC at 18:42:10–18:42:11; Hr'g Tr. at 89:5–6 (Jones). Officer Jones stood a couple feet away from Gray, and said "Do you mind if I see your waistband real quick? I saw you flip to the other side." Jones BWC at 18:42:11. As Officer Jones was speaking, Gray lifted his tee-shirt to reveal the waistband of his shorts and his stomach. Jones BWC at 18:42:11–18:42:14. Gray was still standing so that the front of his body was directed towards the car, and his left side was towards Officer Jones. Officer Jones asked, "Do you mind hiking your shorts up?" at which point Gray began to pull up on his shorts from the pockets. Jones BWC at 18:42:14–18:42:16. Officer Jones then said, "Just pull them back. Grab the front of them and pull them back." Jones BWC at 18:42:14–18:42:26. Officer

Jones testified that he had asked Gray to pull the shorts back because he had seen a bulge in the front of shorts that was "inconsistent with the male anatomy." *See* Hr'g Tr. at 76:1–13 (Jones). As Gray pulled his shorts up and back, a bulge can be seen in the front of his shorts. Jones BWC at 18:42:20. Gray responded to Officer Jones by saying " I pulled them back and  lifted up my shirt," and lifted his shirt again. Jones BWC at 18:42:24–18:42:26. Jones then said, "Do you mind stepping back real quick? I don't mean to give you a hard time, I just saw you flip from the other side over here." Jones BWC at 18:42:26-18:42:29.

At this point, Officer Bewley can be seen walking around the front of the BMW, towards Gray's right side; before that time, Officer Jones was the only officer standing near Gray and speaking with him. Jones BWC at 18:42:27. Officer Bewley testified that he walked towards Gray and Officer Jones because he had seen another person in the driver's seat of the BMW. Hr'g Tr. at 21:20–23, 22:23–23:3 (Bewley). As Officer Bewley approached the BMW, another police officer can also be seen walking towards the driver's side of the car. Bewley BWC at 18:42:21. Officer Bewley walked around the front, driver's side of the BMW and stopped even with the front, right headlight of the car. Bewley BWC at 18:42:29–18:42:31. With Officer Bewley now standing on Gray's right side and Officer Jones on his left side, Officer Jones said, "I'm gonna pat you down real quick, alright?" Jones BWC at 18:42:32–18:42:25. Gray responded, "Go ahead" and put his hands up. Jones BWC at 18:42:34–18:42:35; Hr'g Tr. at 68:23–69:1, 72:22–73:1 (Jones). Officer Jones testified that he had "moved to conduct a protective patdown" because based on his "training and experience, individuals who often carry contraband, namely firearms, carry firearms in that exact same area." Hr'g Tr. at 68:9–18 (Jones). Jones then used his left hand to pat down the area on the front of Gray's shorts and immediately said the code word for a firearm.

Jones BWC at 18:42:35–18:42:39; Hr'g Tr. at 25:2–12 (Bewley), 94:11–14 (Jones).  Gray was then handcuffed.  Jones BWC at 18:42:39–18:43:08.

Officer Bewley retrieved a pair of gloves and a paper bag from the trunk of his car.  Bewley BWC at 18:43:16–18:43:32.  When Officer Bewley returned, Officer Jones pulled back the waistband of Gray's blue athletic shorts and black compression pants, to show a pair of yellow-green boxer briefs.  Jones BWC at 18:43:54–18:44:01.  Gray confirmed at the evidentiary hearing that he was wearing three layers of clothing (shorts, compression pants, and boxer briefs).  Hr'g Tr. at 123:24–124:1 (Gray).  A gun was positioned inside Gray's underwear, with the handle of the gun placed through the slits of the underwear, and the barrel pointing down.  Jones BWC at 18:43:54–18:43:56; Hr'g Tr. at 29:1–13 (Bewley).  Officer Bewley pulled the gun out.  Hr'g Tr. at 28:15–18 (Bewley).  Both Officers Jones and Bewley testified that the gun was positioned in the location of Gray's penis.  Hr'g Tr. at 29:19–30:2, 30:13–20 (Bewley), 67:6–15 (Jones).  During the hearing, to describe where the gun was located on his body, Gray stood up gestured on his body to the same location described by the officers.  Hr'g Tr. at 122:15–21 (Gray).  He also described the location of the gun as "[r]ight in front of my penis."  Hr'g Tr. at 123:4–8 (Gray).

The gun retrieved from Gray is a 40-caliber pistol with a Glock 23 slide, which contained eight rounds of ammunition in a fifteen-round capacity magazine.  Gov.'s Opp'n at 4; Gov.'s Opp'n Ex. 4.

### B.  The Disputed or Controverted Relevant Evidence

The parties first dispute where Gray was standing in relation to the silver BMW as the Gun Recovery Unit officers drove into the alley.  Officers Bewley and Jones testified that they saw Gray standing on the *driver's* side of the BMW before walking around the vehicle to the passenger's side when the officers arrived.  *See* Hr'g Tr. at 20:13–20, 21:4–14 (Bewley), 63:4–12

(Jones).  Officer Tipps testified that he did not recall seeing Gray as they entered the parking lot, but also noted that he was in the backseat of a separate car from Officers Bewley and Jones and there were "several people walking through the parking lot."  Hr'g Tr. at 110:22–11:2, 111:21–23, 112:17–25 (Tipps).  Gray, however, testified that he was standing on the *passenger's* side of the BMW, talking to his girlfriend, as the police cars pulled into the parking lot.  Hr'g Tr. at 118:8–10 (Gray).

The body-worn camera footage does not show where Gray was standing as the Gun Recovery Unit cars pulled into the alley.  Officer Bewley's camera does show the top of the windows of a silver vehicle on his left side as his car pulled even with, and then drove past that car, but does not show Gray standing there.  Bewley BWC at 18:40:20.  By the time Officer Bewley parked and exited the car, Gray was leaning on the window of the passenger's side of the BMW. Bewley BWC at 18:40:49.

However, audio from Officer Jones's body-worn camera and his observations recorded in his *Gerstein* report corroborate his testimony that he saw Gray move from one side of the BMW to the other as the officers approached.  *See* Def.'s Mot. to Suppress, Ex. 1, *Gerstein* Report of Officer Markell Jones ("Gerstein Report"), ECF No. 14-2.  Officer Jones stated to Gray twice that he came over to talk to him because he saw him "flip" to the other side of the car.  *See* Jones BWC at 18:42:11, 18:42:26–18:42:29.  Officer Jones also noted in his *Gerstein*  report that "upon noticing officers," Gray "went to the other side of the vehicle, shielding his front waistband from view of officers, and leaned against the passenger side of the vehicle." *Gerstein* Report at 2.  Based on the contemporaneous statements of Officer Jones to Gray and the notes he recorded close in time to the encounter, the Court finds credible Officer Jones's testimony that he saw Gray walk from the driver's side of the car to the passenger's side of the car upon the arrival of Gun Recovery

Unit officers in the alley.  Moreover, Officer Jones and Officer Bewley—who both testified that they saw Gray standing on the driver's side of the BMW—were on the driver's side of the police vehicle that passed directly next to the driver's side of the BMW.  Officer Tipps, in contrast, was sitting in the backseat on the passenger's side of a separate car.  Therefore, the Court does not find that Officer Tipps's testimony that he did not recall seeing Gray as the officers entered the alley contradicts the observations of the other officers.  Although Gray cannot be seen on any body-worn camera footage as the Gun Recovery Unit cars entered the parking lot, the angle of the cameras would not necessarily have caught him leaning over the driver's side window, as both officers testified, because the videos showed only the very top of a silver car as the police officers passed it on their left.  The Court credits the testimony of Officers Jones and Bewley that they saw Gray walk from the driver's side of the BMW to the passenger's side as the Gun Recovery Unit vehicles entered the alley.

Gray also disputes Officer Jones's observation that once the police officers entered the parking lot, he "began to look at us and he became wide-eyed," Hr'g Tr. at 63:13–15 (Jones), because Gray was wearing sunglasses.  However, based on both the body-worn camera videos and Officer Jones's testimony, Gray's sunglasses were not darkly tinted.  *See* Jones BWC at 18:42:11; Hr'g Tr. at 99:3–16 (Jones).  Officer Jones also noted that Gray caught his attention because he was watching the officers' movements, pointing out that his body-worn camera showed him looking in Gray's direction as he looked in the window of  a car.  Jones BWC at 18:41:09–18:41:11, 18:41:25–18:41:27; Hr'g Tr. at 86:12–24 (Jones).  The Court credits Officer Jones's testimony that he was able to see Gray watching the officers as they exited their vehicles and began to look inside cars parked in the alley for firearms.  *See* Hr'g Tr. at 99:3–16 (Jones).

Lastly, Gray disputes Officer Jones's testimony that he was able to see a bulge in Gray's shorts as he approached Gray. Gray disagreed that the gun was "bulging out" of his shorts, noting that he was wearing compression pants. Hr'g Tr. at 123:9–20 (Gray). Review of Officer Jones's body-worn camera video shows that as Officer Jones approached Gray from Gray's left side, Gray was leaned over the window of the BMW, with his left leg in front and no visible bulge. Jones BWC at 18:42:06–18:42:10. As Officer Jones began speaking to Gray, however, Gray stood up straight and a small bulge can be seen in the front of Gray's shorts. Jones BWC at 18:42:13. Officer Jones's reflection in the window of the silver BMW also appeared to be looking down, in the direction of Gray's groin area, which indicates that the small bulge caught his attention. Jones BWC at 18:42:13. As Officer Jones asked Gray to pull back his shorts, Gray's groin area is not centered in the camera; however, as Gray pulled back his shorts, a bulge is plainly visible on the edge of the area captured by the body-worn camera. Jones BWC at 18:42:20. The Court, therefore, credits Officer Jones's testimony that he noticed a bulge inconsistent with the male anatomy when he was standing close to Gray.

## II.    DISCUSSION

### A. Motion to Re-Open the Suppression Hearing

Before discussing the merits of Gray's motion to suppress, the Court shall address Gray's [22] Motion to Re-Open the Suppression Hearing. After the evidentiary hearing on Gray's motion to suppress, the Government filed a [20] Notice of the Existence of *Giglio* Information ("Gov.'s *Giglio* Notice"), in which the Government indicated that it had failed to notify Gray and his counsel in advance of the May 6, 2021 evidentiary hearing that "U.S. District Judge [Ketanji Brown] Jackson, in a separate case, had issued a ruling pertaining to Officer John Bewley, Metropolitan

Police Department, that could be characterized as an adverse credibility finding." Gov.'s *Giglio*

Notice at 1.  Specifically, Judge Jackson's oral ruling indicated:

> [T]he Court declines to credit Officer Bewley's statement during his
> testimony that the bulge he allegedly observed in Mr. Goodman's
> pants appeared to be hard metal or that it was a hard metal object or
> that the object appeared to have a hard edge, because Officer Bewley
> did not explain how he came to believe that the object was made of
> metal, and in my view, Officer Bewley's body-worn camera footage
> does not corroborate that specific description of any alleged bulge.

*Id.* (quoting *United States v. Goodman*, 19-cv-297-KBJ (D.D.C.), Apr. 9, 2021 Hr'g Tr., ECF No.

20-1).

Gray subsequently filed his [22] Motion to Re-Open the Suppression Hearing, contending

that the Government's failure to disclose the above-cited *Giglio* information deprived Gray of his

ability to question *both* Officers Bewley and Jones about an alleged pretextual justification for

(i.e., that the officers saw a bulge in Gray's groin area).  Def.'s Mot. to Re-Open Hr'g at 2–3.  Gray

contends that Judge Jackson's "credibility determination" regarding Officer Bewley is pertinent to

his case because in both cases "the gun cannot be seen, which the officers claimed they saw."  *Id.*

at 2.  But, in this case, it was *Officer Jones* who testified that he saw the bulge as he approached

Gray and asked him to pull back his shorts.  A slight bulge in Gray's groin area can be seen on

Officer Jones's body-worn camera video.  Accordingly, the Court does not find that the potential

adverse credibility determination made by Judge Jackson with respect to Officer Bewley has any

bearing on the credibility of Officer Jones's testimony that he a saw a bulge in Gray's shorts—a

topic about which defense counsel cross-examined Officer Jones during the hearing.  *See, e.g.*,

Hr'g Tr. at 92:11–24 (Jones).

Moreover, after Gray filed his motion to re-open the suppression hearing, the Government filed a supplemental response, indicating that it had sought clarification from Judge Jackson about her ruling with respect to Officer Bewley.  In a Minute Order, Judge Jackson indicated:

> The Court did not intend to make a "specific adverse credibility determination[ ] finding that Officer was untruthful under oath" with respect to his testimony that he observed an object with a hard metal edge in Defendant's pants . . . Instead, as the Government suggests, the Court merely determined that "the evidence based on [Officer Bewley's testimony] was not sufficiently supported to sustain the government's burden."

Gov.'s Suppl., ECF No. 24 (quoting Minute Order (May 19, 2021), *United States v. Goodman*, 19-cv-297-KBJ (D.D.C.)).  Judge Jackson's ruling clarified that she had not made a "specific adverse credibility determination" as to Officer Bewley, but that the record lacked an explanation as to how he was able to determine that the bulge had a hard metal edge.  Based on the salient facts presented during the evidentiary hearing and the Court's reliance primarily on the testimony of other officers and body-worn camera videos, *see supra* note 4, the Court finds that Gray was not deprived of due process or a fair hearing.  *See* Def.'s Mot. to Re-Open Hr'g at 3.  Accordingly, the Court shall **DENY** Gray's Motion to Re-Open, and shall proceed to discuss the merits of his Motion to Suppress Evidence based on the record as it presently stands.

## B.  Motion to Suppress Evidence

Gray argues that the tangible physical evidence seized by law enforcement from his body on September 4, 2020 was obtained as the result of an unlawful stop and search of his person, in violation of the Fourth Amendment.  As such, Gray argues that the evidence should be suppressed. The Court disagrees and finds that the temporary stop and search of Gray was reasonable, and therefore the evidence was not seized unconstitutionally.

13

"Time and again" the Supreme Court "has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (internal quotation marks omitted). As is relevant here, one of those exceptions occurs when officers conduct a "Terry search." Under *Terry v. Ohio*, 392 U.S. 1 (1968), during a properly justified stop on the street, if a law enforcement officer has a reasonable articulable suspicion that "that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," then that officer may conduct a limited search "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24. In order for a *Terry* search to be justified, the circumstances at the time of the search and seizure must "warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* at 22 (internal quotation marks omitted).

The parties do not dispute that Gray was "seized" within the meaning of the Fourth Amendment; rather they dispute the *timing* of the seizure. Defendant Gray appears to argue that the entire encounter with Officer Jones amounted to a seizure because he was not free to terminate the encounter and leave. *See* Def.'s Mot. to Suppress at 5; Hr'g Tr. at 120:17–20 (Gray) (Q: When Officer Jones approached you, how did you feel? A: I felt like . . I had no choice but to comply with what he was asking me.). The Government concedes that Gray was seized before being physically restrained in handcuffs, but contends that the seizure occurred when the "officers approached defendant from both sides[.]" Gov.'s Opp'n at 5. Because the timing of the seizure implicates the Court's analysis of whether the officers had a reasonable articulable suspicion to stop and search Gray, the Court shall first identify the time at which the seizure occurred.

### 1. Timing of the Seizure

A "seizure" under the Fourth Amendment occurs "when physical force is used to restrain movement or when a person submits to an officer's 'show of authority.'" *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (internal citations and quotation marks omitted).  A "show of authority" is sufficient to constitute a seizure when "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business," *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotation marks omitted), or, in other words, where "a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  In making this determination, courts consider the totality of the circumstances, including "whether the suspect was physically intimidated or touched, whether the officer displayed a weapon, wore a uniform, or restricted the defendant's movements, the time and place of the encounter, and whether the officer's use of language or tone of voice indicated that compliance with the officer's request might be compelled." *United States v. Castle*, 825 F.3d 625, 632–33 (D.C. Cir. 2016) (internal citations, quotation marks and alterations omitted). The person challenging the seizure "bears the burden of demonstrating that he was seized." *Id*. at 633.

Although the Fourth Amendment generally requires that officers have probable cause and a warrant to seize an individual, they need neither probable cause nor a warrant to "briefly detain a citizen" where they "ha[ve] a reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting *Terry*, 392 U.S. at 30).  To "seize[ ] a person on less than probable cause," a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, support a reasonable and articulable suspicion that the person seized is engaged in criminal

activity." *Castle*, 825 F.3d at 634 (internal quotation marks and citations omitted).   The government bears the "burden to provide evidence sufficient to support reasonable suspicion justifying any such stop." *Id*.

The Court's first task is to "pinpoint the time of the stop." *Delaney*, 955 F.3d at 1082.   The Court finds that Gray was *not* seized when Gun Recovery Unit officers entered the alley or during his initial interactions with Officer Jones because a reasonable person would have felt free to terminate the encounter and leave.   "[T]he presence of multiple officers" wearing "[police] gear, including guns and handcuffs" alone is an "insufficient show of authority to make a reasonable, innocent person feel unfree to leave." *United States v. Goddard*, 491 F.3d 457, 461–62 (D.C. Cir. 2007) (per curia).   Rather, the defendant must point to "additional circumstances" that "transform an otherwise consensual police-citizen encounter into a stop." *Delaney*, 955 F.3d at 1082 (quoting *Goddard*, 491 F.3d at 462).

Gray points to no "additional circumstances" during his initial communications with Officer Jones that would have "communicated to a reasonable person" in his position that "he was not at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 437. For example, the police officers did not block the silver BMW from exiting from the alley, but instead parked about 25 to 30 feet away from it, facing in the opposite direction. *See, e.g.*, *United States v. Johnson*, 212 F.3d 1313, 1317 (D.C. Cir. 2000) (finding that although "blocking a vehicle can be the kind of application of physical force that constitutes a seizure," no stop occurred when the police cruiser parked "25 feet away" from the defendant's car, "hardly close enough to block it").   The Gun Recovery Unit arrived during daylight, in a parking lot populated with other individuals.   *See Castle*, 825 F.3d at 632 (noting that the "time and place" of the encounter are relevant factors to consider).   When Officer Jones first approached Gray, he did so by himself; the

16

other Gun Recovery Unit officers were scattered throughout the parking lot and alley, looking inside cars and speaking with other individuals.  In fact, other officers asked individuals in the parking lot if they could search their cars, which the individuals refused without incident.

Gray relies on the concurring opinion in *United States v. Gross*, 784 F.3d 784 (D.C. Cir. 2015) for the proposition that "[n]othing about the Gun Recovery Unit's modus operandi is designed to convey a message that compliance is *not* required."  Def.'s Mot. to Suppress at 5–6 (quoting *Gross*, 784 F.3d at 790 (Brown, J., concurring)).  Gray contends, for example, that the Gun Recovery Unit officers were patting down other patrons in the parking lot and telling other individuals in the parking lot to "lift their shirts up to see the waist area to see if anyone was carrying [a] gun."  Def.'s Mot. at 6; *see also id.* at 6–7 (describing "more than 10 officers [fanning] out and looking into the cars and patting people down").  If that had been the case, the Court would be less inclined to find that Gray's initial interactions with Officer Jones were consensual.  *See, e.g.*, *United States v. Mabry*, --- F.3d ---, 2021 WL 2021618, at *3–4 (D.C. Cir. May 21, 2021) (reasoning that officers' conduct of stopping and patting down other individuals near defendant supported finding of "show of authority" conveying that compliance with the officers' directives was required).  But no evidence or testimony introduced during the May 6, 2021 evidentiary hearing supports these claims that the Gun Recovery Officers were patting down other individuals in the alley or store parking lot.

Moreover, in *Gross,* the court concluded that the defendant had *not* been seized when an officer from the Gun Recovery Unit approached the defendant on the street, asked if he was carrying a gun, and asked him to expose his waistband. *Gross*, 784 F.3d at 787.  The court reasoned that a "seizure does not occur simply because a police officer approaches an individual and asks a few questions."  *Id.* (internal citations and quotation marks omitted).  Even when officers "have

no basis for suspecting a particular individual, they may generally ask questions of that individual . . . as long as the police do not convey a message that compliance with their requests is required." *Id.* (quoting *Bostick*, 501 U.S. at 435). Similarly, here, Officer Jones approached Gray and asked him questions (*e.g.*, "No guns, right? Do you mind if I see your waistband real quick?"). Officer Jones made his requests for Gray to lift up his shirt and pull back his shorts in a calm, polite tone and never used "language or tone . . . indicat[ing] that compliance with [his] request[s] might be compelled." *Castle*, 825 F.3d at 632–33.

Gray also relies on the fact that he was "boxed in" by Officers Jones and Bewley in support of his claim that he was not free to leave. However, he imprecisely describes the timing of when this actually occurred, suggesting that he only complied with Officer Jones's requests to lift his shirt and pull back his shorts because he was "blocked" from leaving by the two officers. Def.'s Mot. to Suppress at 6; *see also* Hr'g Tr. at 121:5–15 (Gray). But Officer Bewley did not come around the front of the car until *after* Officer Jones had already asked these questions and Gray had complied with them. *See* Jones BWC at 18:42:08–18:42:28; Bewley BWC at 18:42:29–18:42:31.

The Government concedes that at the point Officer Bewley walked around the front of the car, Gray was not free to leave. Gov.'s Opp'n at 5 ("Since officers approached the defendant from both sides, leaving was not an option."). The Court agrees that at this point the consensual encounter ripened into a "show of authority" because Gray was now blocked on both sides by police officers and a reasonable person in that situation would not have felt free to leave. *See, e.g.*, *Mabry*, 2021 WL 2021618, at *4 (noting that a "consensual encounter with the police can, subtly, but surely ripen into a show of authority that triggers the Fourth Amendment").

### 2.   Reasonableness of the Seizure and Search.

Having established the timing of the seizure, the Court next considers whether, at that point, the officers possessed "specific and articulable facts" to "support a reasonable and articulable suspicion that [Gray was] engaged in criminal activity." *Delaney*, 955 F.3d at 1085 (quoting *Castle*, 825 F.3d at 634).   In *Terry*, the Supreme Court "held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The Court also held that "during such a stop, an officer may conduct a protective search of the outer layers of the suspect's clothing if he has a "reasonable fear" that the suspect is armed and dangerous." *United States v. Brown*, 334 F.3d 1161, 1164 (D.C. Cir. 2003) (citing *Terry*, 392 U.S. at 30).   In order to justify such a stop and/or search, the officer must be "able to point to specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.   In reviewing whether a stop was justified, courts "look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious." *United States v. McKie*, 951 F.2d 399, 402 (D.C. Cir. 1991) (per curiam).   The government ultimately bears the burden of demonstrating that reasonable suspicion for a stop existed.  *See Castle*, 825 F.3d at 630.

Here, several factors provide a reasonable and articulable suspicion that Gray was engaged in criminal activity to justify the stop.   First, the address to which the Gun Recovery Unit officers responded was known to the police as an area of high gun-trafficking, where gunshots had recently been reported.  *See, e.g.*, *Wardlow*, 528 U.S. at 124 ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis."); *Edmonds*, 240 F.3d at 60 ("[T]he fact that a given locale is well known for

criminal activity will not *by itself* justify a *Terry* stop; but it is among the various factors that officers may take into account.").

Moreover, Gray's conduct as the Gun Recovery Unit officers arrived in the alley supported a reasonable articulable suspicion for the officers to stop and question him. Gray moved from the driver's side of the BMW to the passenger's side which was farther from the police officers. Officer Jones testified that Gray became "wide-eyed" when the officers entered the parking lot, and watched their movements as they exited their vehicles and looked in the windows of other parked cars. *See, e.g.*, *Wardlow*, 528 U.S. at 124 ("[N]ervous, evasive behavior is . . . a pertinent factor if determining reasonable suspicion."). In addition, Gray was standing against the BMW in a way that Officer Jones found suspicious—leaning forward against the window with his left leg (the leg closer to the officer) lunged in front. The Court finds it reasonable that Gray's apparent attempt to conceal the lower part of his body would contribute to Officer Jones's reasonable articulable suspicion that Gray could be dangerous. *See United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017) (finding reasonable suspicion, in part, because the defendant appeared to be concealing something by "pressing the front of his body against the minivan").

Most importantly, Officer Jones testified that when he was standing close to Gray, he observed a bulge in Gray's shorts, "slightly beneath his waistband . . right where his penis would be," and that the bulge was "inconsistent with the human anatomy." Hr'g Tr. at 67:2–10 (Jones). He suspected, based on his "training and experience" that "individuals who often carry contraband, namely firearms, carry firearms in that exact same area[.]" Hr'g Tr. at 68:9–18 (Jones). As Gray lifted his shirt and then pulled back on his shorts, a bulge in the area described by Officer Jones is plainly visible. *See* Jones BWC at 18:42:20. Based on these facts, the Court finds that the officers

had a reasonable articulable suspicion that Gray was engaged in criminal activity to justify the seizure.

Having found that Gray's stop and temporary seizure were justified, the Court must now determine whether or not the officers had reasonable articulable suspicion to conduct a limited search "to determine whether [Defendant was] carrying a weapon and to neutralize the threat of physical harm." *Terry*, 392 U.S. at 24.  The Court concludes that the officers did have a reasonable articulable suspicion for conducting their limited pat-down of Gray, making the search lawful and the evidence obtained admissible.  "The question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them . . . Hence, even though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors — especially when viewed through the eyes of an experienced officer — may." *Brown*, 334 F.3d at 1165 (internal quotation marks omitted).

Here, the same circumstances discussed with respect to the seizure of Gray also support a reasonable articulable suspicion to justify the patdown and subsequent search of Gray's body to retrieve the gun.  These circumstances include the fact that the Gun Recovery Unit officers were responding to a high gun-trafficking area due to reports of recent gunshots nearby, that Gray's conduct suggested he was attempting to shield something from the police officers, and that Officer Jones was able to observe a bulge inconsistent with the male anatomy, which he suspected was a firearm based on his training and experience.  When Officer Jones conducted the patdown, his left hand went immediately to the area he had observed the bulge, where he felt a "the slide and grip of a firearm."  Hr'g Tr. at 69:4–6 (Jones).  Considering the totality of the evidence, the Court concludes that Officer Jones had a reasonable articulable suspicion to conduct a patdown of Gray's

groin area, where he had observed the bulge.  Accordingly, the officers' search and seizure of the loaded firearm did not violate the Fourth Amendment.

## III.    CONCLUSION

For the foregoing reasons, the Court concludes that the September 4, 2020 search and seizure of Gray which resulted in the discovery of a loaded firearm was not in violation of Gray's Fourth Amendment rights.   The Court's conclusion relies on evidence and testimony not implicated by the *Giglio* Notice filed by the Government after the May 6, 2021 evidentiary hearing. Accordingly, the Court will **DENY** Defendant's Motion to Re-Open the Suppression Hearing and will also **DENY** Defendant's Motion to Suppress. An appropriate Order accompanies this Memorandum Opinion.

Dated: May 31, 2021                                  _____/S/_____
                                                                    COLLEEN KOLLAR-KOTELLY
                                                                    United States District Judge